SOBOTKA v CHRYSLER CORPORATION (AFTER REMAND)

Docket No. 96170. Argued November 4, 1993 (Calendar No. 15). Decided August 30, 1994.

Mark Sobotka sought worker's compensation benefits, alleging physical and psychiatric disabilities that arose out of and in the course of his employment with Chrysler Corporation. The plaintiff initially had been paid weekly compensation benefits. He briefly returned to work, but was unable to continue, complaining of pain. Thereafter, Chrysler ceased paying benefits. Eventually, the plaintiff was fired, filed a grievance, obtained reinstatement, and finally was laid off. A hearing referee found that the plaintiff had not proved either that the work-related injury continued to disable him beyond the period he was paid compensation or that any possibly disabling psychiatric condition arose out of or in the course of his employment. The Worker's Compensation Appeal Board, reversed, ordering payment of benefits for partial disability under § 361 of the worker's compensation act, not to exceed $153 a week. The Court of Appeals, WAHLS, P.J., and MAHER and HOOD, JJ., ordered the case remanded to the WCAB to modify its award to specify the extent to which the plaintiff's earning capacity had been impaired, and to fix the amount of the weekly benefits (Docket No. 95053). On remand, the WCAB again awarded the maximum benefit allowable under § 361(1). After remand, the Court of Appeals, WAHLS, P.J., and MAHER and HOOD, JJ., again ordered the case remanded to the WCAB for calculation of the proportional impairment in the plaintiff's earning capacity attributable to his partial disability (Docket No. 103031). After second remand, the WCAB again ordered the defendant to pay $153 per week. The Court of Appeals, WAHLS, P.J., and MAHER and HOOD, JJ., yet again ordered remand, agreeing that the plaintiff's proportionate impairment in earning capacity contributed to his partial disability, corrected the mathematical calculation, and determined the benefit level for two dependents, not to exceed $125.91 (Docket No. 115948). In lieu of granting leave to appeal, the Supreme Court vacated the Court of Appeals order and remanded the case to the Court of Appeals for plenary consideration, 437 Mich 953 (1991). On remand, the Court of Appeals, WEAVER, P.J., and MARILYN J.

KELLY, J. (MICHAEL J. KELLY, J., concurring in part and dissenting in part), affirmed in an unpublished opinion per curiam the award of $153 per week and noted that the plaintiff has a severely limited capacity for employment and has not located employment since his injury (Docket No. 139553). On rehearing, the Court of Appeals, WEAVER, P.J., and MICHAEL J. KELLY, J. (MARILYN J. KELLY, J., dissenting), affirmed, finding that earlier WCAB opinions had awarded the maximum amount allowable on the basis of the plaintiff's actual postinjury earnings rather than his postinjury earning capacity, found the proportionate extent of his impairment in his field of employment at the time of injury to be two-thirds of his average weekly wage at the time of the injury, and calculated the benefit rate to be two-thirds of $283.30, or $126 per week (Docket No. 139553). The plaintiff appeals.

In separate opinions, the Supreme Court reversed the judgment of. the Court of Appeals, reinstated the decision of the WCAB, and remanded the case to the Worker's Compensation Appellate Commission for a determination of the factual dependency of the plaintiff's wife and entry of an award of benefits with statutory interest.

The Court *held:*

Evidence of a lack of wages and of a work-related injury permits an award of maximum benefits. The finder of fact may accept or reject evidence of wages earned, avoided, or refused, or other factors affecting an employee's actual, as opposed to theoretical, employability.

Justice BOYLE, joined by Justice MALLETT, stated that a showing by a partially disabled employee that wage loss is directly attributable to a compensable injury should authorize an award of maximum benefits.

In Michigan, disability is wage loss. Thus, a worker whose disability is total is one who has lost wages because of the injury. Worker's compensation benefits are payable on the basis of wage loss, not on the basis of physical impairment. In a wage-loss system of compensation, such as Michigan's, there is nothing inherently inconsistent with an award of maximum benefits for partial disability where it is found that the claimant, because of the injury, is unable to earn a wage postinjury. The wage-loss system is specifically designed to consider the economic effect of the work-related injury on the individual claimant. It compensates partially disabled workers by basing awards on the average weekly wages the worker is able to earn after the injury. Thus, if an employee is unable to earn wages

postinjury because of the work-related injury, the employee should be entitled to the maximum benefit.

The phrase "able to earn" may be broadly interpreted to take into account many factors, including the availability of jobs, the nature of the work·performed, the continuing availability of work of that kind, the nature and extent of the disability, and the wages earned. Physical incapacity for work alone may not accurately reflect the economic effect on a claimant and cannot be mathematically transformed into a benefit amount. A disabled worker should not bear the burden of unfavorable economic conditions that further diminish his ability to find suitable work. The only burden on the employee is to show a link between wage loss and a work-related injury. Once a work-related injury and subsequent wage loss is shown, the factfinder should be permitted to infer that the employee's wage loss is due to the injury. Where the factfinder is not persuaded, other evidence should be considered. Testimony of vocational experts regarding hypothetical employment is not relevant. However, subject to factfinder discretion, the employer may offer evidence of specific employment offered, refused, or actually accepted to impeach the testimony of the employee.

A partially disabled employee may be awarded the maximum benefit under § 361(1) if the employee shows that the wage loss is due to the work-related injury. The determination that an employee is entitled to an award of benefits involves the threshold determination of degree of disability and the secondary determination of the amount the employee is able to earn postinjury. Where the employee is unemployed, the determination of what the employee is able to earn postinjury does not require theoretical assessment of jobs the employee could perform if available. Instead, if the unemployment is directly attributable to the injury, the finder of fact may award the maximum benefit available pursuant to § 361(1).

Justice LEVIN, joined by Chief Justice CAVANAGH, writing separately, stated that the phrase "able to earn," with respect to both employed and unemployed injured workers, means actual wages earned or refused. Absent actual employment or refusal of an offer of reasonable employment, a disabled worker should be paid the statutorily prescribed benefits.

The words "able to earn" appear in the amendment of § 301 of the worker's compensation act by 1981 PA 200. The Legislature did not intend the words to have one meaning for employed injured workers and another meaning for injured workers who do not obtain employment. Employers are protected from malingerers by the provision that denies benefits during a

period of refusal by an injured worker, without good and reasonable cause, of a bona fide offer of reasonable employment from the previous employer, another employer, or through the MESC.

As a result of the analyses of the lead and the partial concurring/dissenting opinions, employers, motivated by a desire to limit their worker's compensation liability, would be permitted and even encouraged to hire vocational and other expert witnesses to testify in cases with significant liability that postinjury unemployment is not presumptively due to the injury, but to the economy. The force of the remedial nature of the statute would be reduced. Injured workers would be required, in practice, to disprove that economic factors are related to continued unemployment, placing on them an enormous factual and legal burden. The resultant change in practice was not contemplated by the Legislature, nor is it necessary for resolution of this case.

Justice BRICKLEY, joined by Justices RILEY and GRIFFIN, concurring in part and dissenting in part, stated that the Worker's Disability Compensation Act requires the finder of fact to determine the extent a partial injury has impaired wage-earning capacity, requiring remand to the WCAC for a statement of the extent earning capacity has been impaired.

Although the WCAB found the wage loss at issue to be linked to the partial disability, the record does not establish that it found the partial disability to have entirely caused total impairment of earning capacity. It is not sufficient to find some connection between wage loss and partial disability. To obtain maximum benefits, the actual wage loss must be found to have been entirely caused by the work-related injury. If wage loss is only partially due to the work-related injury, partial benefits are in order.

While the determination of partial disability does not foreclose a determination of total impairment of earning capacity as a matter of law, neither does the determination of partial disability establish total impairment as a matter of law. Should a finder of fact determine that a partial disability has only partially impaired earning capacity, compensation should be limited to the extent that the injury has caused unemployment. The proper measure of compensation depends on the economic effect of the work-related injury on the individual claimant. Where an employer suggests that other factors, including general economic conditions, have caused or contributed to the loss of wages, the board must go further than finding partial

disability and some link to the unemployment—it must compute impairment of earning capacity.

The central focus of § 361(1) is on ability or potential for employment and not actual postinjury earnings. Properly interpreted, "able to earn thereafter" provides for consideration of economic conditions and other factors insofar as they reflect the availability of work for partially disabled employees. Where an employee proves an inability to obtain any work because of a partial disability, the maximum rate of compensation should be awarded. Where the lack of opportunity to earn is unrelated to the partial disability, the lack of earnings should not be compensable. In this case, the decision of the Court of Appeals should be reversed and the case remanded to the WCAC for a determination of the extent that the partial disability has caused the unemployment.

Reversed and remanded.

198 Mich App 455; 499 NW2d 777 (1993) reversed.

*Crowley, Olsman, Nolan & Berman, P.C.* (by *Sandra L. Ganos*), for the plaintiff.

*Lacey & Jones* (by *Gerald M. Marcinkoski*) for the defendant.

Amici Curiae:

*Sachs, Waldman, O'Hare, Helveston, Hodges & Barnes, P.C.* (by *Theodore Sachs* and *Granner S. Ries*), for Michigan State AFL-CIO.

*Libner, Van Leuven, Kortering, Evans & Portenga, P.C.* (by *John A. Braden*).

*Bott & Spencer, P.C.* (by *Timothy J. Bott*), for the plaintiff.

*Conklin, Benham, Ducey, Listman & Chuhran, P.C.* (by *Martin L. Critchell*), for Michigan Self-Insurers' Association.

*Glotta, Rawlings & Skutt, P.C.* (by *Richard M. Skutt*), for Michigan Trial Lawyers Association.

*Evans, Pletkovic, Hays & Rhodes, P.C.* (by *John J. Hays* and *William Nole Evans*), for Greater Detroit Chamber of Commerce.

*William G. Reamon, P.C.* (by *William G. Reamon, Jr.*).

AFTER REMAND

BOYLE, J. In the Worker's Disability Compensation Act,[1] the Legislature codifies public policy applicable to, and reflective of, the political give and take of an ongoing economic struggle. Not infrequently, the forum then shifts to the judicial arena. Typically, courts are asked to construe newly enacted legislation and to supply missing pieces of the puzzle that inevitably effect the future direction of the political process. The instant case, however, involves a variation on the usual theme whose seven-year gestation period reflects the significance of the issue to interested parties other than the plaintiff and defendant. In this case we are asked to rediscover in venerable precedent a neglected piece of the puzzle and accordingly limit compensation to partially disabled workers.

In Michigan, disability is wage loss.[2] Thus, a worker whose disability is total is one who has lost his wages because of his injury. We acknowledge at the outset, that our approach to the issue presented here is influenced by a strong disinclination to embark on the process of rolling a rock up a hill the Legislature has only recently decided to climb. In this situation the aphorism that what the Legislature has not supplied the Court will not furnish is not only apt but compelling.

---

[1] MCL 418.101 *et seq.*; MSA 17.237(101) *et seq.*

[2] See 1C Larson, Workmen's Compensation, § 57.22(d), pp 10-192 to 10-204.

The issue is what amount of compensation is due an employee whose "incapacity for work resulting from a personal injury is partial," MCL 418.361(1); MSA 17.237(361)(1),[3] where the statute provides that the "weekly loss in wages . . . shall consist of the percentage of the average weekly earnings of the injured employee . . . as fairly represents the proportionate extent of the impairment of the employee's earning capacity in the employment[ ] . . . in which the employee was working at the time of the personal injury." MCL 418.371(1); MSA 17.237(371)(1).[4] Specifically, we must determine whether the WCAB correctly awarded maximum benefits to the plaintiff, whose disability has been found to be partial, and who has not secured employment since being laid off by defendant several months after injury. We would affirm the award.

Where, on account of an injury, an employee is, in fact, unemployed, the employee is entitled to

[3] At the time of plaintiff's injury, § 361(1) provided:

While the incapacity for work resulting from the injury is partial, the employer shall pay, or cause to be paid to the injured employee a weekly compensation equal to 2/3 of the difference between his average weekly wages before the injury and the average weekly wages which he is able to earn thereafter . . . .

[4] At the time of plaintiff's injury, § 371(1) provided:

The weekly loss in wages referred to in this act shall consist of such percentage of the average weekly earnings of the injured employee computed according to the provisions of this section as shall fairly represent the proportionate extent of the impairment of his earning capacity in the employment in which he was working at the time of the injury, the same to be fixed as of the time of the injury, but to be determined in view of their nature and extent of the injury. The compensation payable, when added to his wage earning capacity after the injury in the same or another employment, shall not exceed his average weekly earnings at the time of such injury.

the maximum benefit allowable under § 361(1),[5] because the employee is not "able to earn" wages postinjury. The Court of Appeals reduced the maximum benefit amount by estimating the employee's remaining earning capacity. In directing the agency to apportion benefits, the Court misinterpreted and misapplied the law, and invaded the province of the finder of fact. We would reverse the decision of the Court of Appeals and reinstate the decision of the WCAB.

I

Plaintiff, Mark Sobotka, began working for defendant, Chrysler Corporation, in September, 1972, and continued as a Chrysler employee until January, 1979. Defendant employed plaintiff as an inspector in its Hamtramck assembly plant. To perform the inspector's job, plaintiff was required to bend repeatedly, stand constantly, perform overhead work from a pit underneath a vehicle body, and inspect the underside of vehicle bodies from a kneeling position. In May, 1978, Sobotka was inspecting one vehicle body when another vehicle body moved down the line and pinned him between the two. As a result, he suffered injuries to his back and legs.

Plaintiff's petition for hearing alleged that he sustained a personal injury to his back and lower extremities that resulted in disability. The petition also alleged a psychiatric occupational disease as a result of the personal injury. The hearing referee found that plaintiff had not sustained his burden of proving either that the work-related injury "continued to disable him beyond the period he

---

[5] This means that the partially disabled employee's only burden is to show he is unable to earn wages because of his injury, not that he must show that the economy or other factors are not the cause of unemployment.

was paid weekly compensation benefits," or that any possibly disabling psychiatric condition arose out of or in the course of his employment.

On review, the Worker's Compensation Appeal Board found that plaintiff's work-related injury continued to disable him beyond the date that defendant had stopped paying benefits. It ordered defendant to pay benefits for partial disability pursuant to § 361 of the act "not to exceed $153.00 a week until further order of the Bureau."[6]

The ensuing history of the case includes three appeals by defendant of orders of the WCAB, three orders of remand from the Court of Appeals, one order of remand from this Court, and two opinions of the Court of Appeals before this Court's order granting leave. Much of that time, as detailed next, was consumed by a protracted disagreement of interpretation between the Court of Appeals and the Bureau of Worker's Disability Compensation,[7] whose provenance is, in all events, unclear. Although reluctant to burden the opinion with

[6] The $153 award was the maximum amount allowable in 1978 for a partially disabled employee with two dependents. It was also the maximum amount allowable for one totally disabled with two dependents. Legislative Service Bureau Pamphlet, Worker's Disability Compensation Act of 1969 and Administrative Rules, Tables, p 127 (March, 1991).

[7] See, e.g., *Rutland v General Motors Corp (On Remand)*, 1990 WCABO 1054; *Manninen v Ishpeming Steel Co (On Remand)*, 1989 WCABO 1407 (both providing examples of the disagreement between the WCAB and the Court of Appeals in interpretation of the statutory sections and case law).

The disagreement in interpretation has continued with the advent of the Worker's Compensation Appellate Commission. See *Garofalo v I Miller/Rayne Debman Shoes*, 1990 WCACO 1196, 1200 (the commission will not speculate regarding an abstract wage-earning capacity); *DeMarc v General Safety Corp*, 1990 WCACO 764, 766 (the commission will not "measure some abstract residual ability of a partially disabled employee to perform some employment and then speculate as to the amount of wages that that injured employee might have earned had that hypothetical employment been secured and compensated"); *Sutter v Rockwell Int'l*, 1990 WCACO 203, 205 (§ 361[1] is an offset provision and does not "require a speculative analysis of the amount of wages an injured claimant might be able to earn; it

such detail, the significance of the issue requires
inclusion of the tortuous course of this litigation.

A

Defendant's first appeal challenged, among other
things, the clarity of the WCAB's order to pay
compensation "not to exceed $153.00." Plaintiff did
not respond. Defendant argued that once the right
to compensation had been determined, "the
Board's legal obligation [was] to compute in dollars
and cents the amount of partial disability benefits
[the employee] is to receive." Citing *Thayer v
Britz*, 234 Mich 645; 209 NW 50 (1926), and *Bar-
rett v Bohn Aluminum & Brass Co*, 69 Mich App
636, 641; 245 NW2d 147 (1976), the Court of Ap-
peals agreed and remanded the case to the WCAB
to "modify its award to specify the extent to which
plaintiff's earning capacity has been impaired, and
fix the amount, in dollars and cents, of the weekly
benefits due accordingly." Unpublished order of
the Court of Appeals, entered December 23, 1986
(Docket No. 95053). The WCAB again awarded the
maximum benefit allowable under § 361(1).

Defendant's second appeal contended that the
WCAB had equated "able to earn" under § 361(1)
with actual wages earned, and erroneously
awarded maximum compensation benefits "pay-

provides credit for those wages actually earned postinjury"); *Harris v
United Technologies*, 1989 WCACO 1087, 1091-1092 ("[I]f an injured
employee's ability to do one job, or even various jobs, wiped out her
employer's obligation to pay her compensation, there would be no
point to having [§] 361's setoff provisions—the employee who can do
some work, and does it, would be entitled to nothing. Nor would there
be any point to the Act's extensive provisions regarding favored work;
injured employees on favored work, doing a job within their qualifica-
tions and training, would be entitled to nothing if the ability to earn
some wages at various tasks were the standard of disability"); *Olson v
K mart Corp*, 1989 WCACO 830, 832 (§ 361[1] "is an offset provision
for computational purposes, and not for purposes of speculating what
plaintiff, who was not working at the time of hearing, might some day
be able to earn in wages").

able as if he was totally disabled, . . . despite the fact that the Board finds that the employee is only partially disabled." Again, the Court of Appeals agreed with defendant, and again the Court of Appeals remanded the case to the WCAB

> for the purpose of calculating, in dollars and cents, the proportionate impairment in plaintiff's earning capacity attributable to his partial disability, in accordance with the guidelines set forth in *Trask v Modern Pattern & Machin[e] Co*, 222 Mich 692, 697-699 [193 NW 830] (1923). *Thayer v Britz,* 234 Mich 645, 647 (1926). Plaintiff's post-injury earnings are merely one factor to be considered; the Appeal Board's opinion and order of July 31, 1987 treats those post-injury earnings as the sole factor of relevance, contrary to the analysis set forth in *Trask, supra.* [Unpublished order of the Court of Appeals, entered March 25, 1988 (Docket No. 103031).]

The opinion of the WCAB at issue here is the opinion on second remand, which reached yet another panel of the WCAB. This panel, as had the two before it, also ordered that defendant was to "pay compensation at the rate of $153.00 per week . . . until further order." Although not a model of clarity, the board's opinion states:

> Based upon the fact that plaintiff has not been able to earn any wages after his January 17, 1979, layoff, the medical testimony of Dr. Larkin, Dr. Goldberg, and Dr. Weisman concerning the nature and extent of plaintiff's injuries, we find that plaintiff does suffer from a disability which severely limits his ability to engage postemployment.[8] We also find that plaintiff's proportionate

---

[8] In the Court of Appeals opinion on rehearing, this portion of the board's opinion was quoted as " 'severely limits his ability to engage [in] post[injury] employment.' " 198 Mich App 455, 458; 499 NW2d 777 (1993).

impairment in earning capacity attributed to his partial disability is two-thirds of $283.30 or $153.00 per week for two dependents.

Therefore, defendant shall pay plaintiff compensation at the rate of $153.00 per week for two dependents based upon two-thirds of plaintiff's average weekly wage of $280.30 pursuant to MCL 418.361[(1)]; MSA 17.237(361)(1) from February 15, 1979, to March 27, 1981, the date of Closing of Proofs in this matter. Thereafter, defendant shall pay compensation at the rate of $153.00 per week pursuant to MCL 418.361[(1)]; MSA 17.237(361)(1) from March 28, 1981, until further order. Interest due and owing on these benefits shall be paid at the rate of 10% per annum. [1989 WCABO 126, 128-129.]

Defendant's third appeal resulted in another remand to the WCAB. This time the Court of Appeals stated it agreed with what it characterized as a "finding" by the WCAB that " 'plaintiff's proportionate impairment in earning capacity attributed to his partial disability is two-thirds of $283.30' . . . as supported by the requisite scintilla of evidence required by Const 1963, art 6, § 28 and § 861 of the Act." However, the Court of Appeals "corrected" the WCAB's arithmetic. It stated "[t]wo-thirds of $283.30 is not $153, but $188.87. Pursuant to § 361(1), plaintiff's weekly disability benefit may not exceed two-thirds of his loss in average weekly wage, or $125.91. On remand, the appeal board shall determine plaintiff's benefit level for two dependents, not to exceed $125.91." Unpublished order of the Court of Appeals, entered July 26, 1989 (Docket No. 115948). The Court of Appeals denied rehearing.

Plaintiff filed an application for leave to appeal with this Court. In lieu of granting leave to appeal, we vacated the Court of Appeals order of July 26, 1989, and remanded the case to the Court

of Appeals for plenary consideration. 437 Mich 953 (1991).

B

In its initial decision on remand from this Court, the Court of Appeals affirmed the March 10, 1989, decision of the WCAB, which awarded plaintiff $153 per week. It noted that "[t]he record below indicates that plaintiff had a severely limited capacity for employment and has not located employment since his injury." Unpublished opinion per curiam of the Court of Appeals, issued June 29, 1992 (Docket No. 139553), slip op at 2.[9]

The defendant moved for rehearing in the Court of Appeals, arguing that the Court had repeated the WCAB's mathematical error. It stated that while the Court's order of July 26, 1989, had corrected this mathematical error, it had repeated it in its June 29, 1992, decision. The Court granted defendant's motion for rehearing.

On rehearing, a majority of the Court of Appeals[10] characterized the earlier WCAB opinions as having awarded the maximum amount allowable on the basis of only plaintiff's actual postinjury earnings rather than plaintiff's postinjury earning

[9] However, it remanded the case to "allow the WCAB to address the unresolved factual issue of whether plaintiff's wife is in fact dependent." *Id.* The factual dependency of plaintiff's wife remains, as of this date, unresolved.

[10] The dissent in the Court of Appeals did not agree that the calculation was controlled by *Trask* and *Thayer,* because unlike *Trask* and *Thayer,* in which the claimants had returned to work, Sobotka had not been able to return to the job at which he had been injured, nor had he been able to find other employment. Moreover, the dissent would have given greater deference to the WCAB's interpretation of the act. The dissent noted that the effect of the majority's decision would be to require expert testimony in worker's compensation proceedings regarding jobs available within the employee's limitations.

The decision was published upon defendant's motion for publication.

capacity. It interpreted the 1989 wcab opinion as having determined that the proportionate extent of plaintiff's "impairment in the field of employment in which he was engaged at the time of injury is two-thirds."[11] 198 Mich App 455, 463; 499 NW2d 777 (1993). It affirmed the wcab's factual finding as supported by the requisite evidence, and described that finding as "the proportionate extent of plaintiff's earning capacity, in light of all relevant factors, is two-thirds of his average weekly wage at the time of the injury." *Id.* at 464.[12] It then calculated plaintiff's benefit rate as two-thirds of two-thirds of $283.30, or $126, as rounded off to the nearest dollar. It reasoned that under *Trask, Thayer,* and *Barrett, supra,* this was the correct method of calculation, and it ordered that the defendant "pay plaintiff benefits at the rate of $126 a week less any applicable credit for wages actually earned pursuant to § 371(1), until further order of the bureau." 198 Mich App 465.[13]

What finally emerges from the multiple appeals and remands is that the plaintiff is partially disabled, that three separate panels of the wcab believe him to be entitled to the maximum allowa-

[11] In effect, the Court of Appeals found that plaintiff could compete for one-third of the jobs available in common labor.

[12] Defendant characterizes this as a factual finding made by the wcab. Whether the wcab would have made this "finding" absent repeated remand orders from the Court of Appeals is problematic. Moreover, the wcab awarded the full benefit amount available at the time to one who was partially disabled with two dependents.

[13] In other words, the Court of Appeals understood the wcab decision to mean that plaintiff's earning capacity had been impaired by two-thirds. Because plaintiff retained one-third of his earning capacity, according to the Court of Appeals he was "able to earn" $94.43 after his injury within the meaning of § 361(1). Then, following the formula set out in that section, the Court of Appeals subtracted $94.43 from the plaintiff's average weekly wage at the time of the injury, $283.30, resulting in a $188.87 weekly loss in wages. It then calculated two-thirds of that wage loss to award a weekly wage-loss benefit of $125.91, $126 rounded off to the nearest dollar. The Court of Appeals did not take into account that the wcab had awarded the maximum benefit allowable under § 361(1).

ble benefit,[14] and that a majority of the Court of
Appeals judges believe that *Trask* and *Thayer*
require postinjury calculation of the theoretical
extent of the impairment of a partially disabled
worker's earning capacity and compensation on
the basis of the application of that figure to aver-
age weekly wages.

On plaintiff's application, we granted leave to
appeal. 443 Mich 869 (1993). We would hold that
where unemployment of a partially disabled em-
ployee is found to be directly attributable to the
compensable injury, maximum benefits may be
awarded. The agency is not required to estimate
the hypothetical extent of impairment. Availabil-
ity of maximum benefits is a factual issue for
factual resolution. We would reverse the decision
of the Court of Appeals and remand to the WCAB
for further proceedings.

II

Worker's compensation benefits in Michigan are
payable on the basis of wage loss and not on the
basis of physical impairment. St. Antoine, Work-
ers' Compensation in Michigan, Costs, Benefits,
and Fairness, A Report to Governor Blanchard,
December 12, 1984, p 25. Under a physical impair-

---

[14] Thus, three times the WCAB has found a total impairment in
wage earning capacity caused by plaintiff's disability. The WCAB's
findings of July 31, 1987 ("[w]e initially find that there is no evidence
in the record to indicate that plaintiff has been able to find suitable
work"), and February 10, 1989 ("Based upon the fact that plaintiff
has not been able to earn any wages . . . [and medical testimony] we
find that plaintiff does suffer from a disability which severely limits
his ability to engage post-employment. We also find that plaintiff's
proportionate impairment in earning capacity attributed to his par-
tial disability is two-thirds of $283.30 or $153.00 per week for two
dependents"), were made in response to orders upon remand by the
Court of Appeals to specify the extent to which the plaintiff's wage
earning capacity had been impaired. These repeated findings under-
score the pointlessness of a remand for yet another WCAB review.
BRICKLEY, J., *post*, p 42.

ment system, benefits are based upon a percentage
of disability measured in terms of a "'whole,'
healthy person." *Id.* Benefits are paid depending
upon the percentage of physical impairment,
whether or not there has been any actual loss in
wages. *Id.*; see also 1C Larson, Workmen's Compensation, § 57.14(a)-(j), pp 10-69 to 10-104; *Gamula
v General Motors Corp,* 1987 WCABO 2178, 2184,
vacated and remanded on other grounds. The
physical impairment theory, however, does not
"reflect accurately the widely varying economic
impact of particular injuries on particular people."
St. Antoine, *supra* at 25.

Where benefits are awarded on the basis of wage
loss, however,

> [t]he central idea is that each injured worker will
> be treated individually, and will receive, in addition to necessary medical expenses, a percentage
> of his or her actual wage loss (or more precisely,
> loss of earning capacity), however short or long
> that loss may continue. The key advantage of this
> approach, of course, is that it adapts much more
> readily to the widely varying circumstances of
> given cases. The lawyer who has lost the little
> finger on his left hand will receive little or nothing; the concert pianist with the same injury will
> be entitled to benefits until reasonable alternative
> employment is made available. . . .
>
> The most important point to be gleaned from all
> this analysis is that in a wage-loss system, such as
> Michigan's, once "disability" is established, the
> extent of disability makes little or no difference.
> As long as the disability continues, however slight
> it may seem in terms of physical impairment, full
> compensation benefits will at least theoretically be
> due from the employer. Inability to earn wages in
> fact will *presumptively* be the measure of the loss
> of wage earning capacity. Whether an employee is
> technically "totally disabled" or "partially disabled" is unimportant as a practical matter. In

either case he or she will receive full benefits under Michigan law if substitute employment is not proffered. [*Id.* at 25-26.]

Thus, in a wage-loss system of compensation, there is nothing inherently inconsistent with an award of maximum benefits for partial disability where the board has found that the claimant, because of the injury, is "[un]able to earn" a wage postinjury. Unlike the physical impairment system, the wage-loss system is specifically designed to consider the economic effect of the work-related injury on the individual claimant.

In 1912 the Legislature adopted a wage-loss system of compensating injured workers. 1912 (Ex Sess) PA 10. Indeed, the Legislature specifically provided for an award based upon the injury's specific economic effect on the worker by basing awards to those partially disabled on the worker's "average weekly wages which he is able to earn" after the injury. Thus, if an employee is unable to earn wages postinjury because of the work-related injury, the employee is entitled to the maximum benefit.

A

The WCAB found that plaintiff is partially disabled. That finding has never been challenged. Therefore it turned to § 361(1) to compute the benefit amount. Under § 361(1) the benefit amount to be awarded is "2/3 of the difference between his average weekly wages before the injury and the average weekly wages which he is able to earn thereafter . . . ."

Defendant contends that under *Trask* it is error to award a partially disabled worker maximum compensation without consideration of more than

simply the plaintiff's postinjury unemployment. The essence of the argument is that a worker who is partially disabled may not suffer a total impairment of wage-earning capacity. Thus, defendant contends that the necessary corollary to a factual finding that any claimant is partially disabled is that the claimant possesses some residual capacity to work and earn wages. Defendant submits that it follows, under § 371 and *Trask,* that residual capacity is translated into a mathematical formulation of a proportionate extent of impairment of earning capacity and that to obtain maximum benefits, the plaintiff must prove an inability to obtain *any* employment[15] because of the work injury.[16]

---

[15] Were we to adopt defendant's argument, we would, by judicial fiat, be adopting a system of eligibility for wage-loss benefits akin to the "extremely strict definition" employed in Social Security disability determinations. There it is provided that

"an individual . . . shall be determined under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. 42 USC 423(d)(2)(A)." [St. Antoine, *supra* at 27-28.]

[16] See, e.g., *The implications of* Sobotka, 3 Welch On Workers' Compensation 80, 81 (June, 1993). The article notes that the probable results of the Court of Appeals decision in *Sobotka* will be a need for expert testimony from vocational experts, increased attorney involvement in worker's compensation cases, erosion of Michigan's current "wage loss" approach to compensation and a substitution of a "physical impairment" approach.

See also Cope, *Partial disability: The impact of* Paschke *and* Sobotka, 32 Workers' Comp L R 31, 33 (March, 1993). The author, a worker's compensation magistrate, notes that "the *Sobotka* majority opinion leaves many unanswered questions as to the precise litigation and assessment of such cases[ ]" one of which was the method to be used to determine "the extent of wage earning capacity . . . ."

See also *Court of Appeals redefines partial disability,* 3 Welch On Workers' Compensation 41, 54 (April, 1993). The article notes:

Plaintiff responds that § 361(1) should be interpreted to apply to those situations in which an injured employee has been offered and has wrongfully refused postinjury employment or in which an injured employee has voluntarily left postinjury employment. Under this approach, the wages the claimant could have earned in the proffered employment, or in the employment that the claimant voluntarily left, would be determinative of the wage the employee was "able to earn" postinjury. In essence, plaintiff argues that "able to earn" under § 361(1) should be interpreted as actual wages earned, or refused, postinjury.

The Court of Appeals erred in apparently accepting defendant's contention that as a matter of law a determination of partial disability forecloses a determination of impairment of earning capacity greater than the degree of disability found. The Court of Appeals held that "the average weekly wages [a partially disabled employee] is able to earn thereafter" can never be so low as to allow an award of benefits for partial disability that equals the maximum amount allowable for one totally disabled. The Court of Appeals erroneously presupposes that incapacity for work[17] and impairment in earning capacity are synonymous. We

This case has the potential to greatly reduce the benefits received by many injured workers and thus reduce the costs to employers.

If this approach becomes pervasive, litigated cases will certainly become more complicated requiring some proof, probably from vocational experts, of each worker's wage earning capacity. It is not clear how this would affect the large number of cases in which workers are paid with no litigation.

[17] "Incapacity for work" is a phrase imported from the early British worker's compensation acts. As used in the British acts, "incapacity for work" included an "inability to get work because of the injury, as well as inability to perform the work because of the injury . . . ." Anno: *Inability to get work because of injury, as "incapacity for work" within the meaning of the workmen's compensation act,* 1916A LRA 380, 380. " '[I]ncapacity for work' may mean physical inability to

reject the conclusion because incapacity for work and impairment in earning capacity are not logically synonymous, and because we do not discern a clear legislative direction that they are legally synonymous.

Because the Legislature did not set out a formula through which the wages an employee is "able to earn" postinjury might be calculated, and because the Legislature did not define "able to earn," we must determine what the Legislature intended by the phrase.[18]

---

do work so as to earn wages, or it may mean inability to earn wages by reason of inability to get employment, due to the belief of employers in the unfitness of the workman to perform work owing to the injuries they perceive he has sustained." *Id.* at 381 (quoting *Ball v Hunt,* a 1912 English case; see also anno: *Workmen's compensation: Statutory phrase "incapacity for work" or the like, as including inability to obtain work following an injury,* 33 ALR 115. In one early Irish case the court noted:

> "The assumption that the allowance for partial incapacity should be less than the allowance for total incapacity is entirely without foundation. In a case like this, where the uncontradicted evidence is that the workman was earning nothing, and could earn nothing at present, the county court judge has full jurisdiction, according to his discretion, to allow him the same amount as he would be entitled to receive on a basis of total incapacity." [*Id.* at 119-120 (quoting *Osborne v Tralee & D R Co,* a 1913 Irish case).]

[18] Plaintiff was injured in 1978. The law in effect at the time, *Kidd v General Motors Corp,* 414 Mich 578, 582; 327 NW2d 265 (1982), did not include a legislative definition of disability. We therefore express no opinion about the effect of later amendments of the act on those situated similarly to the plaintiff, but whose injuries occurred after these amendments.

We have consistently recognized that the Worker's Disability Compensation Act is remedial legislation, and as such is to be "liberally construed to grant rather than deny benefits." *Bower v Whitehall Leather Co,* 412 Mich 172, 191; 312 NW2d 640 (1981), citing *Niekro v The Brick Tavern,* 66 Mich App 53; 238 NW2d 537 (1975), and *McAvoy v H B Sherman Co,* 401 Mich 419; 258 NW2d 414 (1977). See also *Lahti v Fosterling,* 357 Mich 578; 99 NW2d 490 (1959). In addition to its compensatory function, the act encourages rehabilitation of the employee because "[i]t is in the interest of the employer, the employee, and the public to have the employee return to gainful

The phrase "able to earn" may be broadly or narrowly interpreted. *Regency Inn v Johnson,* 422 So 2d 870, 875 (Fla App, 1982) (en banc). "In the broadest sense, 'able to earn' takes into account many factors, including the availability of jobs . . . ." In its narrowest sense, " 'able to earn' . . . refer[s] only to the employee's post-accident physical capabilities." *Id.* at 875, n 2. The "broad interpretation is consistent with prior case law, and with the principle that requires a liberal construction in favor of the injured employee." *Id.* at 875.

According to Professor Larson, the phrase "able to earn thereafter" is synonymous with the concept of "wage-earning capacity."[19]

> Even under those statutes which compare, for example, "average monthly wages before the accident" with "the monthly wages he is able to earn thereafter," the test remains one of capacity. If the legislature had spoken of the wages "he has earned thereafter," or even the wages "he has been able to earn thereafter," the comparison of actual wage with actual wage might be indicated. But the concept of wages he "is able" to earn cannot mean definite actual wages alone, especially in the absence of a fixed period of time within which post-injury wages are to be taken as

employment as soon as possible." *DeTroyer v Ernst Kern Co,* 282 Mich 689, 694; 277 NW 199 (1937).

[19] The phrase "wage earning capacity" itself may be broadly or narrowly construed.

> It may, in its narrower sense, refer only to the employee's earning capacity in the employment in which he was working at the time of the accident, so that, for compensation purposes, the earning capacity remaining to the employee in other callings is not considered at all. On the other hand, it may refer, in its broad sense, to the loss of ability of the employee to earn wages in any, or any suitable employment. [Anno: *Workmen's compensation: Right to compensation as affected by fact that injured employee earns, or is offered, as much as, or more than, before the injury,* 149 ALR 413, 415.]

controlling. [Larson, *supra,* § 57.21(a), pp 10-122 to 10-128.][20]

Therefore, an examination of previous decisions discussing "wage-earning capacity" is instructive. At the outset, we again note that, consistent with a wage-loss system of compensation, the concept of "wage-earning capacity . . . is a complex of fact issues which are concerned with the nature of the work performed and the continuing availability of work of that kind, and the nature and extent of the disability and the wages earned." *Pulley v Detroit Engineering & Machine Co,* 378 Mich 418, 423; 145 NW2d 40 (1966). In short, many factors are considered when attempting to give meaning to the phrase.

> What is meant by the term "wage-earning capacity after the injury?" It is not limited to wages actually earned after injury, for such a holding would encourage malingering and compensation is not a pension. On the other hand mere capacity to earn wages, if "nondescript" by reason of injury, affords no measure unless accompanied by opportunity to obtain suitable employment. Opportunity is circumscribed by capacity of the injured and openings to such a wage earner. . . .
>
> An injured person may recover to the point where he can, if favored, perform special service, if such is obtainable, *but, if none can be obtained because of his injury, his capacity to work and earn cannot be measured against his incapacity.* If his injury isolates him from employment then, of course, he is not to be held to have capacity to work and earn wages. If his injury has reduced his capacity to work and relegated him to the rating of "odd lot" or "nondescript" workers for whom labor openings are extremely limited, then oppor-

---

[20] See also *Pulley v Detroit Engineering & Machine Co,* 378 Mich 418, 423; 145 NW2d 40 (1966) (equating the phrase " 'able' to earn" with wage-earning capacity).

tunity, within his capacity, should be made to appear. [*Hood v Wyandotte Oil & Fat Co,* 272 Mich 190, 192-193; 261 NW 295 (1935). Emphasis added.][21]

Thus, we long ago acknowledged that an employee's physical "incapacity for work" alone may not accurately reflect the economic effect on a claimant and cannot be mathematically transformed into a benefit amount.[22]

A broad interpretation of the phrase "able to earn thereafter" is supported by an early opinion of the Industrial Accident Board, precursor of the Worker's Compensation Appeal Board. The opinion cautioned against reducing compensation on the basis of a partially disabled employee's physical ability to perform work without more. The Industrial Accident Board recognized:

An employe who is recovering from an injury, and who has recovered so far that the disability is only partial, cannot reasonably be required in his partially disabled condition to go among strangers looking for work. Such requirement would not be reasonable, and the probabilities of his obtaining work if required to so seek it would be very remote. On the other hand if his employer has work suitable for him to perform in his partially disabled condition, and which he can do without

---

[21] Our decision in *Hood,* which affirmed an award of total disability benefits, was based in part upon *Jordan v Decorative Co,* 230 NY 522, 525; 130 NE 634 (1921), in which the New York Court of Appeals noted that "[r]ebuff, if suffered, might reasonably be ascribed to the narrow opportunities that await the sick and halt. In such circumstances, disability, followed by search for work and failure, will justify the inference of diminished earning capacity." *Id.* at 526.

[22] Courts in other states have reached the same conclusion. See, e.g., *Lewis G Reed & Sons, Inc v Wimbley,* 533 So 2d 628, 631 (Ala App, 1988) ("the percentage of physical impairment is not the same as the percentage of disability"); *West Coast Insulation v Lee,* 464 So 2d 1317 (Fla App, 1985) (a ten to twenty percent physical impairment entitled the claimant to the same benefits as are awarded for total disability).

causing suffering or inconvenience, and offers to give him such work, then it is the duty of such employe to accept the work tendered and thereby reduce the liability for compensation. That if the employer has no such suitable work, or having such work fails to tender it to the injured employe, *the compensation cannot be reduced upon the theory that there are classes of work which he is able to do and which he might obtain perhaps if he diligently sought for it,* and which on the other hand he might not be able to obtain at all. [Bulletin No 3, Michigan Industrial Accident Board, *Partial Disability; Duty to Seek Employment,* p 10 (December, 1913). Emphasis added.]

This is not to say that unemployment alone will support an award of maximum benefits for partial disability. Wage loss of a partially disabled worker must be attributable to the claimant's work-related injury. See *Pulley, supra* at 428; *Kadykowski v Briggs Mfg Co,* 304 Mich 503, 506; 8 NW2d 154 (1943); *MacDonald v Great Lakes Steel Corp,* 274 Mich 701, 703; 265 NW 776 (1936). However, the factfinder may infer " 'that it was [the employee's] own physical defects which [would have] made the quest a vain one.' " *Hood, supra* at 193, quoting *Jordan v Decorative Co,* 230 NY 522, 525; 130 NE 634 (1921). It is for this reason that Professor St. Antoine observed that there is little difference between total and partial disability as "a practical matter."

The phrase "average weekly wages he is able to earn thereafter" does not mean that the unemployed injured worker, whose lack of employment is *not* due to the work-related injury can only be denied benefits if the employer has offered work to the employee or found work for the employee. "[T]he real inquiry relates to the monetary worth of the injured workman's services in the open labor market under normal employment condi-

tions." *Jones v Cutler Oil Co,* 356 Mich 487, 490; 97 NW2d 74 (1959). However, a disabled worker does not bear the burden of unfavorable economic conditions that further diminish his ability to find suitable work.

### B

Given our rejection of the claim that *Trask* stands for the proposition that the plaintiff must prove the absence of any jobs generally available in the economy, part III, we turn to some observations regarding the burden of proving that post-injury unemployment is due to the work-related injury. Consistent with our prior cases and the provisions of the WDCA,[23] we would hold, that it is the employee's burden to show a link between wage loss and the work-related injury. *MacDonald, supra* at 702-703. "This is merely an application of the rule that the burden of proof of right to compensation and its amount is on the employee." *Id.* at 703.

However once the employee shows a work-related injury and subsequent wage loss, the fact-finder may infer that the employee cannot find a job because of the injury. *Hood, supra* at 193.[24] The inference, "in practical effect," will often carry the day. Where the factfinder is not persuaded, other evidence of the link between unemployment and

---

[23] See also MCL 418.851; MSA 17.237(851) ("A claimant shall prove his or her entitlement to compensation and benefits under this act by a preponderance of the evidence").

[24] In *Hood,* plaintiff's work-related disability not only incapacitated him from returning to work as a manual laborer, but also kept him from being able to find work as a barber, an occupation for which he had previously been trained. See also *Coleman v Whitehead & Kales Co,* 268 Mich 412; 256 NW 467 (1934) (even though the plaintiff received higher wages for a period of time after his injury doing lighter work, he remained eligible for benefits after being laid off when he was unable to find employment because of his work-related injury).

injury may be considered. For example, in the instant case the employee presented evidence that he sought and could not obtain employment and evidence of defendant's refusal to rehire, which has been described as strong evidence of unemployability. Larson, *supra,* § 57.61(b), pp 10-398 to 10-405; *Leonardo v Uncas Mfg Co,* 77 RI 245; 75 A2d 188 (1950).[25]

Of course, the employer may introduce evidence to refute the inference or to impeach the testimony of the employee. The employer might introduce medical evidence to refute the extent of the employee's injury. The employer might also introduce evidence of other factors[26] that affect the employee's employability.[27] Furthermore, the employer might introduce evidence of jobs offered and rejected, or actually accepted, by the employee.[28]

---

[25] But cf. *Goudie v Lakey Foundry & Machine Co,* 327 Mich 138; 41 NW2d 496 (1950). After firing the claimant for not passing its physical examination, the defendant claimed that the claimant had no physical defect so as to be found disabled. The claimant's attorney agreed that the claimant had no real medical disability. Even without the defendant's argument, it would have been error to award benefits in light of the claimant's counsel's concession.

[26] According to Professor Larson:

> Of course, if the claimant's continued unemployment is the result, not of his employment-related impairment, but of personal ailments unrelated to his employment, there is no possible ground for continuing temporary benefits. [Larson, *supra,* § 57.12(e), p 10-56.]

[27] For example, Chrysler suggests that plaintiff's preexisting psychiatric condition is responsible for his continued unemployment. However, there is no evidence in the record to indicate that plaintiff's psychiatric condition affected the performance of his duties at Chrysler. Moreover, the WCAB, even with evidence of plaintiff's psychiatric condition before it, specifically linked plaintiff's continued unemployment to plaintiff's medical condition. Findings of fact made by the board are conclusive absent fraud, if there is any evidence in the record to support them. *Kostamo v Marquette Iron Mining Co,* 405 Mich 105, 135-136; 274 NW2d 411 (1979). MCL 418.861; MSA 17.237(861); Const 1963, art 6, § 28.

[28] Placing the burden of coming forward with evidence to refute the

In a given case the employer might even proffer evidence regarding the availability of specific employment to impeach the plaintiff's testimony. The factfinder, in its discretion, may accept or reject such testimony on the basis of its bearing on the proposition for which it is offered and the legislative purpose to provide prompt redress for injuries.

We reject the contention, however, that plaintiff bears the burden of producing evidence of jobs he could not perform if theoretically available and that defendant's offer of evidence of plaintiff's ability in the abstract to perform some employment rebuts the inference of causation that arises from a showing of unemployment and injury.[29] To

---

inference that arises from injury plus unemployment on the employer simply recognizes a certain vigilance in which employers ordinarily should engage.

Diligence, of course, cannot stop with the initial investigation of the accident. There should be continual follow-up. If a worker is claiming a long term disability, there should be an "activities check" at least once a year. (Some would say every six months.) Common sense would of course suggest an investigation more often under certain circumstances.

If, for example, Mr. A wants his checks sent to a post office box, it might be a reason for concern. If Ms. Y never answers the phone between 8:00 A.M. and 5:00 P.M., it is time to check up on her. These are routine things that a claims person should be sensitive to.

An "activities check" usually starts with someone talking with people in the neighborhood. If they all say, "Oh, poor old Joe, he can't do anything at all," it can probably stop there. If however, they say "Joe? We didn't know there was anything wrong with him," further investigation is in order. This usually means that someone gets out a van and a video camera and follows Joe around for a few days.

I want to emphasize that this is not new or unusual. This is routine. Some of the people who have given stories to the media act as if they just discovered fraud. Insurance companies have been doing this kind of investigation for years. An employer should expect it as part of the claims adjusting service. [*Workers' Comp Fraud: What is it? How bad is it? What can be done about it?*, 3 Welch On Workers' Compensation 77, 99 (June, 1993).]

[29] In this regard, our holding today is consistent with our holding in

do so would undermine the function of the fact-finder and impermissibly substitute a court-created definition of disability under the rubric of wage-earning capacity. Testimony from vocational experts regarding hypothetical employment is not an element of the claim of impairment of wage-earning capacity.[30] We decline to create a presumption in the employer's favor that if an injured employee is capable of performing some work, appropriate work is regularly available. See Larson, *supra*, § 57.51(c), pp 10-334 to 10-335. It is not "enough to show that claimant is physically capable of performing light work, and then round out the case for non-compensability by adding a presumption that light work is available." *Id.* at § 57.61(c), p 10-437.

III

Because findings of fact are conclusive in the absence of fraud, defendant necessarily contends that the Legislature intended that a finding of partial disability is an inference or conclusion of residual capacity for work, and that § 371(1), *Trask,* and *Thayer* require a mathematical calculation of the proportion of impairment of earning

*Tulk v Murray Corp*, 276 Mich 630; 268 NW 761 (1936). We were unwilling then to inflate an employee's postinjury wage-earning capacity by multiplying employee's wages earned in a single day by six, in the same way an employee's preinjury average weekly wage was determined, in order to determine the employee's wage-earning capacity after the injury. We are similarly unwilling today to open the door to speculation leading to an inflated postinjury wage-earning capacity. A primary goal of the worker's compensation system is prompt, fair, adequate compensation for work-related injuries. Extended fact-finding proceedings regarding theoretical employment opportunities would do nothing to further this goal.

[30] Justice BRICKLEY's approach invites the prospect of a parade of experts that would be necessary to hypothesize the percentage of plaintiff's wage loss due to his disability. We reject the implicit burden placed on the plaintiff to refute theoretical allegations of what work he could do.

capacity that is then transposed onto the benefit calculation. The logic is that if A plus B equals total preinjury capacity for work as measured by average weekly wages, and B is impaired by injury, the benefit amount awarded is the difference.

*Trask* would allow the board to consider a general decrease or increase[31] in wages resulting from changes in the economy as one of the factors to be used to determine the proportionate extent of an impairment of earning capacity. However, that aspect of *Trask* was mooted by the Legislature,[32] as we recognized in *Roxbury v Weidman Lumber Co,* 268 Mich 596, 599; 256 NW 560 (1934) ("the statute, in designating the wage at the time of injury and constituting such the basic figure, permits no consideration of a general wage decrease").[33]

We decline the invitation to breathe new life into *Trask* by finding in its dormant ashes a requirement of a mathematical calculation of percentage of impairment of earning capacity measured by theoretical ability to exercise residual capacity. Rather, to the extent that *Trask* has

[31] Indeed, the annotation cited with approval by the Court in *Trask* discussed how an increase in general wages could be considered in order to compensate an injured worker in a way that would truly approximate the effect of the injury on the worker's earning capacity. Therefore, following a time of general wage increase, the board could consider the higher wages being paid for the work a claimant had been doing and base compensation on that higher wage, rather than the wages the claimant had actually earned when injured.

[32] 1927 PA 376 amended § 11(e) (now § 371[1]) of the act to include a cap upon the amount an employee could receive as compensation for wage loss. It added the following proviso: "The compensation payable, when added to his wage earning capacity after the injury in the same or another employment, shall not exceed his average weekly earnings at the time of such injury."

[33] Contrary to Justice BRICKLEY's characterization, *Roxbury* dealt exclusively with an employer's attempt to reduce his employee's partial disability award, claiming that the employee's disability caused him no decrease in earning capacity, and that the reduction in wages from what the employee had earned before his accident was due to a general wage decrease. We rejected the employer's assertions, and refused to reduce disability compensation on that basis. *Roxbury, supra* at 599.

contemporary vitality,[34] the Court's directive to the Industrial Accident Board to consider many factors in determining the amount of compensation to be awarded is consistent with the broad interpretation of "able to earn thereafter." Absence of wages may or may not be attributable to partial disability. All that *Trask* requires is "a factual link between the partial medical impairment and the reduction of wages." Leslie, *The tortured course of the definition of disability in Michigan workers' compensation law, past, present and future,* 5 Cooley L R 65, 82 (1988).[35]

IV

Findings of fact made by the WCAB are binding on this Court if supported by any evidence in the record. *Kostamo v Marquette Iron Mining Co,* 405 Mich 105, 135-136; 274 NW2d 411 (1979); MCL 418.861; MSA 17.237(861); Const 1963, art 6, § 28. We may also infer from those findings other findings that were necessary to reach the legal conclu-

[34] In fact, Leslie notes that in *Roxbury* the Court "appeared to overrule *Trask* and excise consideration of economic factors in cases of partial as well as total disability." Leslie, *The tortured course of the definition of disability in Michigan workers' compensation law, past, present and future,* 5 Cooley L R 65, 88 (1988).

[35] We also do not read *Thayer, supra,* in the manner urged by defendant. *Thayer* did not require a calculation of proportionate extent of impairment in earning capacity. Citing *Trask* as explaining the method for computation of diminution in earning capacity, we remanded to the board for it to compute the amount due in dollars and cents on the basis of the proportionate extent of the impairment of the employee's earning capacity. That is not to say that the board was to use plaintiff's thirty to seventy-five percent partial disability to reduce the sixty percent of his loss in average weekly wages that he was entitled to under the statute.

Finally, *Barrett, supra,* also stands for the proposition that there must be a link between unemployment and injury. Thus, where the plaintiff had voluntarily removed himself from the work force in order to further his education, and where the plaintiff had already established a postinjury average weekly wage, it was error to award compensation on the basis of an ability to earn less than what had been established.

sion. *Donahoe v Ford Motor Co,* 295 Mich 422, 427; 295 NW 211 (1940). In the instant case, the board found as fact from the plaintiff's testimony regarding his lack of success in finding work[36] and from the medical testimony,[37] that plaintiff's ability to earn was severely circumscribed. The WCAB could infer[38] that his fruitless search for work was

[36] At the hearing plaintiff testified:

> *A.* I had leg problems, back problems. I tried to get a job. I tried to get some kind of job, anything. I just couldn't get it.
> *Q.* Where did you try and get a job?
> *A.* I went to Burger King. I couldn't get nothing.
> *Q.* Can you think of anyplace else where you tried to get a job?
> *A.* I put in lots of applications. I can't recall.
>
> * * *
>
> *A.* I'm unable to do—get a job. Can't get a job.
>
> * * *
>
> *Q.* You indicated you attempted to find some job since you left Chrysler. I think one was Burger King?
> *A.* I tried there. I tried to get a job and a few other places, you know, I got Burger King. I did get a formal—like a . . .
> *Q.* Interview?
> *A.* Interview. The rest I put in applications.
> *Q.* What are some of the places you applied?
> *A.* Whenever I find light kind of work out of the paper in which I couldn't find.
> *Q.* Do you remember any of the names at all?
> *A.* No. That I remember because I got a letter they did not accept me.

[37] The board credited the testimony of three physicians who had examined plaintiff on several occasions. One physician noted that "plaintiff should not lift or bend or be in any stressful situation where he is going to use his back." 1989 WCABO 126, 128. Another physician noted shortly after the injury, that "plaintiff should not be given work, which required constant standing, squatting, or climbing for at least three to four weeks." *Id.* Their diagnoses were: "sciatica, lumbosacral myositis, and arthritis," "chronic lumbosacral back strain and possible herniated lumbar disc." *Id.*

[38] We remain committed to the principle:

> [W]e cannot review a decision of the WCAB as a question of law unless its findings of fact are sufficiently detailed so that we can separate the facts it found from the law it applied, and

due to his injury. *Hood, supra.*

It then became incumbent upon defendant to come forward with evidence to refute plaintiff's contention. While defendant presented evidence regarding plaintiff's physical and mental condition, the WCAB found that plaintiff had satisfied his burden of proof. The WCAB's finding of fact in this regard is binding on us on review.

We decline to interpret the WCAB opinion in the manner interpreted by the Court of Appeals. The WCAB awarded plaintiff the maximum benefit rate allowable under § 361. The WCAB considered plaintiff's testimony and that of the physicians who examined him. It did not, as the Court of Appeals characterized the WCAB opinion, "juxtapose" the medical testimony, the lay testimony, and the claimant's inability to find work. Instead, plaintiff's proofs established a link between the injury and the unemployment.

> We suggest that it lies within the power of the participants in the workers' compensation system itself to avoid wage loss claims which might be considered unwarranted or excessive by concentrating their efforts on rehabilitation and reemployment of injured workers, rather than by aiming for technical interpretations by which it is hoped to defeat or diminish the recovery of benefits by the injured employee. [*Regency Inn, supra,* 422 So 2d 880.]

-----

that conclusory findings are inadequate because we need to know the path it has taken through the conflicting evidence, the testimony it has adopted, the standards followed and the reasoning used to reach its conclusion. [*Kostamo, supra* at 136.]

Accordingly, we urge the factfinder in contested compensation cases to make findings of fact regarding a claimant's postinjury wage-earning capacity sufficiently detailed to allow the appellate courts to intelligently review its decision.

V

In sum, a partially disabled employee may be awarded the maximum benefit under § 361(1) if the employee shows that wage loss is due to the work-related injury. The determination that an employee is entitled to a benefit award involves the threshold determination of degree of disability and the secondary determination of the amount the employee is able to earn postinjury. Where the employee is unemployed, the determination of what the employee is able to earn after the injury does not require theoretical assessments of jobs the employee could perform if available. Instead, if the unemployment is directly attributable to the injury, the finder of fact should award the maximum benefit available pursuant to § 361(1). Thus, we would reverse the decision of the Court of Appeals, reinstate the original decision of the WCAB, and remand to the WCAC to determine the factual dependency of plaintiff's wife and to enter an award accordingly. Plaintiff is entitled to ten percent statutory interest.

MALLETT, J., concurred with BOYLE, J.

LEVIN, J. (*separate opinion*). I agree with the signers of the lead opinion that the decision of the Court of Appeals should be reversed, that the original decision of the WCAB should be reinstated, and that this case should be remanded to the Worker's Compensation Appellate Commission to determine the factual dependency of Sobotka's wife and to enter an award with statutory interest.

I write separately because I do not agree with all the analysis and statements in the lead opinion, and because I do not agree with statements in

the opinion that concurs in part and dissents in part.

The focus of both the lead and the concurring/dissenting opinions is on the meaning of the words "able to earn."[1]

The lead opinion states: "In essence, plaintiff argues that 'able to earn' under § 361(1) should be interpreted as actual wages earned, or refused, postinjury."[2] The lead opinion appears to reject plaintiff's argument.[3]

I agree with the plaintiff that "able to earn" means essentially actual wages earned or refused.

---

[1] The statute now provides:

While the incapacity for work resulting from a personal injury is partial, the employer shall pay, or cause to be paid to the injured employee weekly compensation equal to 80% of the difference between the injured employee's after-tax average weekly wage before the personal injury and the after-tax average weekly wage which the injured employee is *able to earn* after the personal injury, but not more than the maximum weekly rate of compensation, as determined under section 355. [MCL 418.361(1); MSA 17.237(361)(1). Emphasis added.]

Mark Sobotka was injured in May, 1978, sixteen years ago. At that time, the clause, "which the injured employee is able to earn after the personal injury," read "which he is able to earn thereafter." This clause took its present form when 1980 PA 357 amended 1969 PA 317.

[2] *Ante,* p 19 (opinion of BOYLE, J.).

[3] The lead opinion also states:

The phrase "average weekly wages he is able to earn thereafter" does not mean that the unemployed injured worker, whose lack of employment is *not* due to the work-related injury can only be denied benefits if the employer has offered work to the employee or found work for the employee. [*Ante,* p 24 (opinion of BOYLE, J.). Emphasis in original.]

I recognize that the lead opinion may be seen as not absolutely rejecting plaintiff's argument because of the qualifying language, "whose lack of employment is *not* due to the work-related injury." (Emphasis in original.)

I

The words "able to earn" appear in 1981 PA
200, amending § 301 of the worker's compensation
act.[4] The Legislature there stated that if disability
is established, "entitlement" to weekly wage loss
benefits "*shall* be determined" pursuant to the
amendatory language. If an injured worker is
employed, the wages he actually earns or refuses
after the date of the injury is the amount he is
"able to earn."

The Legislature did not intend that the words
"able to earn" have one meaning for injured work-
ers who are employed and another meaning for
injured workers who do not obtain employment.
For both employed and unemployed injured work-
ers, "able to earn" means wages actually earned or
refused. The employer is protected from malinger-

---

[4] The amendatory language provides in part as follows:

If disability is established pursuant to subsection (4), *entitle-
ment* to weekly wage loss benefits *shall be determined pursuant
to this section and as follows:*
(a) If an employee receives a bona fide offer of reasonable
employment from the previous employer, another employer, or
through the Michigan employment security commission and
the employee refuses that employment without good and rea-
sonable cause, the employee shall be considered to have volun-
tarily removed himself or herself from the work force and is no
longer entitled to any wage loss benefits under this act during
the period of such refusal.
(b) If an employee is employed and the average weekly wage
of the employee is less than that which the employee received
before the date of injury, the employee shall receive weekly
benefits under this act equal to 80% of the difference between
the injured employee's after-tax weekly wage before the date of
injury and the after-tax weekly wage which the injured em-
ployee is *able to earn* after the date of injury, but not more
than the maximum weekly rate of compensation, as determined
under section 355. [MCL 418.301(5); MSA 17.237(301)(5), added
by 1981 PA 200. Emphasis added.]

ers by the provision[5] that denies benefits during the period of a refusal, without good and reasonable cause, by an injured worker of a bona fide offer of reasonable employment from the previous employer, another employer, or through the MESC.

I recognize that Sobotka was injured in 1978, before the enactment of the 1981 amendment. And I also recognize that this meaning was given to the words "able to earn" by an amendment of § 301, and that § 361, where those words also appear in the context of defining the compensation payable to a partially disabled worker, was not amended. The Legislature did not intend that the words "able to earn" have different meanings under § 361 and § 301.

The Legislature indicated in 1981 what "able to earn" means,[6] and, thus, whatever constructions might, but for the 1981 amendment, have been placed upon "able to earn" on the basis of exegeses of earlier case law, those words mean actual wages earned or refused by the injured worker.[7]

While the lead and the concurring/dissenting opinions modify somewhat the Court of Appeals opinion, they both ignore that the Legislature

---

[5] See n 4 for text of subsection 5(a) of § 301 of the worker's compensation act.

[6] Surely, it will not be contended that the Legislature could not, after the date of injury, amend the statute to indicate what those words mean. In all events, Sobotka appears to be one of a handful of pending cases remaining undecided, where the injury date precedes the effective date, March 31, 1982, of the 1981 amendment. It is therefore probably of relatively little importance whether the amendment is retroactive.

[7] I would also read the 1981 legislation, adding § 301(5) to the worker's compensation act, as legislative recognition and acceptance that, under the case law after Trask v Modern Pattern & Machine Co, 222 Mich 692; 193 NW 830 (1923), and Thayer v Britz, 234 Mich 645; 209 NW 50 (1926), a worker, totally or partially disabled, is not deemed "able to earn" wages unless he has obtained alternative employment, or, in the case of a worker who has not obtained alternative employment, the worker refuses employment provided by the employer or another employer.

indicated in the 1981 legislation what "able to earn" means.[8] The likelihood is that the meaning ascribed to "able to earn" today by the lead and concurring/dissenting opinions will be seen as the last word concerning what those words mean, rather than speaking as of 1978 and as leaving open the question what those words mean beginning March 31, 1982.

That "able to earn" means actual wages earned or refused appears clearly from Dean St. Antoine's report, written in 1984—three years after the 1981 amendment. Dean St. Antoine stated that the total disability/partial disability distinction is no longer important "as a practical matter." "In either case," the injured worker receives full benefits *"if substitute employment is not proffered."*

> The most important point to be gleaned from all this analysis is that in a wage-loss system, such as Michigan's, once "disability" is established, the extent of disability makes little or no difference. As long as the disability continues, however slight it may seem in terms of physical impairment, full compensation benefits will at least theoretically be due from the employer. Inability to earn wages in fact will presumptively be the measure of the loss of wage earning capacity. Whether an employee is *technically "totally disabled" or "partially disabled" is unimportant* as a practical matter. *In either case* he or she will receive *full benefits* under Michigan law *if substitute employment is not proffered.*[9] [Emphasis added.]

Dean St. Antoine so reported to the governor in

---

[8] The lead opinion states that "because the Legislature did not define 'able to earn,' we must determine what the Legislature intended by the phrase." *Ante,* p 20 (opinion of BOYLE, J.). For the reasons stated, I conclude that the Legislature has defined "able to earn."

[9] St. Antoine, Workers' Compensation in Michigan, Costs, Benefits, and Fairness, A Report to Governor Blanchard, December 12, 1984, p 26.

1984, nine years before the Court of Appeals decided *Sobotka v Chrysler Corporation (On Rehearing)*, 198 Mich App 455; 499 NW2d 777 (1993).

## II

The cases relied on by the Court of Appeals, *Trask v Modern Pattern & Machine Co*, 222 Mich 692; 193 NW 830 (1923), and *Thayer v Britz*, 234 Mich 645; 209 NW 50 (1926), decided approximately seventy years ago,[10] concerned the computation of benefits in cases where the worker obtained alternative employment. In the instant case, Sobotka has not obtained reemployment. The partially disabled workers in *Trask* and *Thayer* were not exposed to the risk of denial of all compensation because of a theoretical opportunity to obtain employment or because of general economic conditions.

The Court of Appeals read *Trask* and *Thayer* as requiring that the trier of fact determine a residual wage-earning capacity. The concurring/dissenting opinion would affirm[11] that reading of §§ 361 and 371.[12]

I agree with the signers of the lead opinion that we should not "breathe new life into *Trask* by finding in its dormant ashes a requirement of a mathematical calculation of [the] percentage of impairment of earning capacity measured by theoretical ability to exercise residual capacity."[13] I would add that the predicate of *Trask* and *Thayer* has been superseded by subsequent amendments of the worker's compensation act, and that *Trask* and

---

[10] The analysis relied on in these cases by the Court of Appeals and adverted to in the lead and concurring/dissenting opinions has not been relied on in subsequent decisions of this Court.

[11] *Post,* p 54 (opinion of BRICKLEY, J.).

[12] MCL 418.371; MSA 17.237(371).

[13] *Ante,* p 29.

*Thayer* ceased long ago to have any precedential force.

### III

Dean St. Antoine acknowledged in his report to the Governor the arguments advanced by the employers in this case and by the concurring/dissenting opinion[14] when he reviewed the policy considerations:

> The notion that a disability of any degree will create the possibility of life-long benefits will undoubtedly be viewed by the injured worker as no more than his fair entitlement. In his continuing incapacity, or even recurrence of incapacity, to match his wage level at the time of injury can be traced back to that initial injury, why should not his entitlement to compensation parallel that loss of earnings or of earning capacity? On the other hand, *what the employer sees is an employee with only a moderate physical impairment who is hardly worse off, in the sense of employability, than many other fellow unemployed workers in a recessionary or underemploying economy. In essence, the employer sees the workers' compensation system being transformed into a specialized high-benefit unemployment compensation program.*
>
> The sad fact, as I see it, is that both the employee and the employer are right, from their particular perspectives. The Michigan system should seem entirely fair to all parties in periods of relatively full employment. Either the case law or the new statutory definition of "disability" may or may not be rather generous in sweeping injured workers within the coverage of the system. *But such workers lose their entitlement to benefits if they unreasonably refuse bona fide offers of alternative employment,* and the compensation due

---

[14] For example, *post,* p 54, n 19 (opinion of BRICKLEY, J.).

them is reduced proportionately by their earnings in any employment. *The rub comes when that other employment is not available, or is available only intermittently.*[15] [Emphasis added.]

Dean St. Antoine clearly saw that under the statute as amended in 1981, the employer would be required to pay benefits although no employment was available because of economic conditions.

I read Dean St. Antoine's review of Michigan law as an attempt to accurately state Michigan's worker's compensation law as it was when he reported to Governor Blanchard. In so reporting, he was, of course, not speaking for this Court, but he was reporting on the basis of the commonly held view of what the law was. Justice Oliver Wendell Holmes, Jr., in his oft-quoted dictum, observed: "The prophecies of what the courts will do in fact, and nothing more pretentious, are what I mean by the law."[16]

Dean St. Antoine made his prophecy on the basis of the statute, the history of its amendment, case law, and the practice as understood by practitioners representing employers as well as workers. Dean St. Antoine could not have anticipated or prophesied the revisionist approach reflected in the Court of Appeals opinion, as modified by the lead and concurring/dissenting opinions.

Absent actual employment or refusal of an offer of reasonable employment, a disabled worker should be paid the statutorily prescribed benefits without regard to factors made relevant by the lead and concurring/dissenting opinions.

---

[15] St. Antoine, n 9 *supra,* pp 26-27.

[16] Holmes, *The path of the law,* 10 Harv L R 457, 461 (1897).

## IV

Dean St. Antoine's report recommended fundamental procedural changes to cope with the backlog of the Worker's Compensation Appeal Board that had reached almost 7,000 by 1984, roughly a five-year caseload. The sea change in the determination of eligibility for worker's compensation benefits that would be brought about by the Court of Appeals opinion in *Sobotka,* as modified by the analysis in the concurring/dissenting opinion, would assuredly result in undermining that legislative effort to reduce the backlog.[17]

Under the concurring/dissenting opinion, employers, motivated by a desire to limit their worker's compensation liability, would be permitted and even encouraged to hire vocational and other expert witnesses to testify in cases with significant liability that postinjury unemployment is not presumptively due to the injury, but to "the economy."[18]

The analysis adopted in the concurring/dissenting opinion would greatly reduce the force of the remedial nature of the statute. The push is on to move disabled workers from totally disabled to partially disabled, and then to deny benefits because, as a result of economic conditions, no jobs are available. Injured workers would be required, in practice, to disprove that economic factors are related to continued unemployment, placing on

[17] It appears that an employer henceforth may offer evidence concerning "availability of specific employment to impeach the plaintiff's testimony" (*ante,* p 27, opinion of BOYLE, J.) without showing an actual job offer to the plaintiff.

[18] The introduction of poor economic conditions as affecting compensation benefits ignores the hardships faced by an injured worker in a competitive environment. "[A] man with a stiffened arm, or damaged back, or badly weakened eye will presumably have a harder time doing his work well and meeting the competition of young and healthy men." 1C Larson, Workmen's Compensation, § 57.31(c), p 10-219.

them an enormous factual and legal burden.[19] The resultant change in practice was not contemplated by the Legislature. Nor is it necessary to resolution of the instant case, now pending for a substantial part of the sixteen years since injury.

CAVANAGH, C.J., concurred with LEVIN, J.

BRICKLEY, J. (*concurring in part and dissenting in part*). While I concur in some of the reasoning of the lead opinion, namely, that an inference of total impairment of earning capacity is permitted where a partially disabled employee has not performed any work, I write separately to express my understanding that the Worker's Disability Compensation Act[1] requires the finder of fact to determine the extent the partial injury has impaired wage-earning capacity. Although I concur with the lead opinion for reversal of the rationale employed by the Court of Appeals, I dissent from affirmance of the WCAB. Because the board has never stated that it found total impairment of earning capacity, I would remand for a statement of the extent earning capacity has been impaired.

Although the WCAB found the wage loss to be linked to the partial disability, the record does not establish that it found the partial disability to have entirely caused total impairment of earning capacity. It is not sufficient to find some connection between wage loss and partial disability. For a claimant to obtain maximum benefits, it must be found that the actual wage loss is entirely caused by the work-related injury. If wage loss is only

---

[19] Magistrates would be faced with the daunting task of deciding whether wage loss is due to disability or economic factors. The result would be an increase in litigation costs, and an increase in the backlog of cases.

[1] MCL 418.101 *et seq.*; MSA 17.237(101) *et seq.*

partially due to the work-related injury, then partial benefits are in order.

Unlike the lead opinion, I would not find *any* link between partial disability and total unemployment to be sufficient to establish the maximum award under MCL 418.361(1); MSA 17.237(361)(1).[2] Only where the finder of fact determines the partial disability to be the sole reason for total unemployment should full benefits be awarded.

I

In the present case, the claimant, an unskilled laborer, has established a partial disability caused by a work-related incident. The claimant has had no actual earnings. The defendant employer presented evidence of reasons other than the injury to account for the plaintiff's unemployment. The plaintiff suffered from a nonwork-related, serious psychological condition (manic depression or schizophrenia) before and following the work-related back injury. After his initial recovery from the workplace accident, the plaintiff tried to return to his former employment, but complained of pain and was discharged. The plaintiff contested the discharge and was eventually reinstated. However, by the time the plaintiff was reinstated, his position had been eliminated because of plant-wide layoffs. When questioned by defendant about efforts to find other employment after he was unable to be reinstated, the plaintiff could only specify one unsuccessful application to Burger King.[3]

---

[2] At the time of plaintiff's injury, a partially disabled employee received compensation payable pursuant to the provisions of § 361(1). See *ante,* p 7, n 3 for the text of the statute as it read at that time.

[3] The defendant asserts that there was evidence from which the finder of fact could infer that the plaintiff had little, if any, monetary incentive to seriously seek reemployment within his residual earning capacity. The plaintiff testified that he receives or has received social

The defendant employer's position is that it is error to award full benefits on a finding of partial disability unless the plaintiff proves he has no residual earning capacity. Plaintiff contends that where there is any partial disability, maximum benefits should be automatically awarded unless the claimant has been offered and has wrongfully refused postinjury employment. It is my conclusion that both positions are inaccurate. The proper interpretation of § 361(1) lies somewhere in the middle of the two arguments.

I agree with the lead opinion that the Court of Appeals erred in presupposing the partial disability determination to be synonymous with the extent earning capacity has been impaired. While I agree that the determination of partial disability does not foreclose a determination of total impairment of earning capacity as a matter of law, neither does the determination of partial disability establish total impairment as a matter of law. I disagree with the lead opinion to the extent it is suggesting that partial disability is to be considered the equivalent of total impairment. Neither interpretation is true to the statute as it read when Sobotka was injured.[4]

Even the most casual reading of the statute compels the conclusion that the factfinder in a worker's compensation case at the time this case was tried was instructed to assess the residual earning capacity at the first hearing. Should a finder of fact determine that a partial disability has only partially impaired earning capacity, in that there are other reasons for total postinjury

security disability benefits, sickness and accident benefits, extended disability benefits, unemployment compensation benefits, and supplemental unemployment benefits.

[4] Since amended by 1980 PA 357, § 1 and 1985 PA 103, § 1.

unemployment, compensation should be limited to the extent the injury has caused unemployment.[5]

I would agree that under a wage-loss system such as ours, the proper measure of compensation depends on the economic effect of the work-related injury on the individual claimant. The lead opinion states "[w]here, on account of an injury, an employee is, in fact, unemployed, the employee is entitled to the maximum benefit allowable under § 361(1) . . . ." *Ante,* pp 7-8. The lead opinion further states "we long ago acknowledged that an employee's physical 'incapacity for work' alone may not accurately reflect the economic effect on a claimant and cannot be mathematically transformed into a benefit amount." *Ante,* p 23. I do not dispute that we recognized early in worker's compensation law that a partially disabled person faces hurdles to future employment that extend beyond the physical limitations experienced by the worker. *Hood v Wyandotte Oil & Fat Co,* 272 Mich 190, 193; 261 NW 295 (1935) (quoting *Jordan v Decorative Co,* 230 NY 522, 525; 130 NE 634

---

[5] Defendant points out that there are cases in which a residual earning capacity is low, but not nonexistent, that will nonetheless support a maximum award:

The Court should realize that under certain circumstances even a partially disabled employee can recover the maximum rate of compensation. This occurs where the employee's residual capacity to earn is very low in comparison to the employee's wages at the time of injury. For example, if an employee has a high average weekly wage (say, $1,000 per week), but is only able to earn at the minimum wage level thereafter, then two-thirds of the difference between the employee's average weekly wage at the time of injury and the amount the employee is able to earn thereafter would still place the employee's rate above the maximum rate; therefore, the partially disabled person would receive the maximum rate. MCL 418.361(1); MSA 17.237(361)(1) [as it read at the time of the instant plaintiff's injury]. The maximum rate is prescribed by statute, tied to a percentage of the state average weekly wage, and adjusted yearly. MCL 418.355; MSA 17.237(355).

[1921]) (" 'Failure to find work stands upon a different basis when the labor is unmarketable because of the condition of the laborer' ").

It does not follow, however, that because we acknowledge disabled persons face additional hurdles, we acquiesce in the abandonment of any attempt to determine residual earning capacity. "[C]ompensation law is to be construed liberally to provide indemnity for accidents peculiarly incidental to employment, but it was not intended to be health, accident and old age insurance and spread general protection over risks common to all and not arising out of and in the course of employment." *Simpson v Lee & Cady,* 294 Mich 460, 463; 293 NW 718 (1940). The purpose of worker's compensation is to approximate the amount of wage loss attributable to the work injury. *Foley v Detroit United Railway,* 190 Mich 507, 515; 157 NW 45 (1916).

This is not the first time this Court has been asked to interpret what factors are appropriate to consider when determining impairment of earning capacity[6] or whether the "able to earn thereafter" language of § 361(1) refers to actual wages alone.[7] *Trask v Modern Pattern & Machine Co,* 222 Mich

---

[6] When originally enacted in 1912, an injured worker's compensation was measured by impairment of earning capacity:

The weekly loss in wages referred to in this act shall consist of such percentage of the average weekly earnings of the injured employe, computed according to the provisions of this section, *as shall fairly represent the proportionate extent of the impairment of his earning capacity* in the employment in which he was working at the time of the accident, the same to be fixed as of the time of the accident, but to be determined in view of the nature and extent of the injury. [1912 (Ex Sess) PA 10, part II, § 11. Emphasis added.]

[7] 1912 (Ex Sess) PA 10, part II, § 10 was amended by 1927 PA 63, part II, § 10 (the version found at *ante,* p 7, n 3 and was still in effect in 1978, the time of plaintiff's injury).

692, 696; 193 NW 830 (1923), established that an employer is not liable for lost wages that were caused by a downturn in the economy rather than the partial disability.[8] In *Thayer v Britz,* 234 Mich 645; 209 NW 50 (1926), we remanded to the precursor of the board for a determination of impairment of earning capacity. "Having found partial disability it was the duty of the board to compute in dollars and cents the proportionate extent of the impairment of his earning capacity in accordance with [what is presently §§ 361 and 371]." *Id.,* p 647. While this principle may have been long neglected by the WCAB,[9] it has been applied by the Court of Appeals[10] and has not been explicitly

[8] The employee in *Trask* developed a serious infection and blood poisoning after receiving a minor skin laceration in the office where she worked as auditor and office manager. By the time she recovered, her employer had experienced a decline in business and had reduced the number of its employees, along with reducing some wages. Her position had been eliminated. *Id.,* pp 693-694.

Although the employee was able to find subsequent employment with another company as a bookkeeper, the position paid thirty dollars less per week. Rather than affirm the award of the difference between preinjury and postinjury wages, this Court remanded for a determination of what part of the wage loss was due to the injury. We stated that changes in labor conditions and wages are elements to be considered in the determination of the proportionate extent of impairment of earning capacity. *Id.,* p 698.

[9] See *ante,* p 9, n 7.

[10] See, e.g., *Juneac v ITT Hancock Industries,* 181 Mich App 636, 641; 450 NW2d 22 (1989) ("The applicability of § 361 . . . includes not only wages actually earned after the injury, but also any the employee has the capacity to earn"); *Stallworth v Chrysler Corp,* 144 Mich App 706; 375 NW2d 797 (1985) (remand for determination of earning capacity); *Mitchell v General Motors Corp,* 89 Mich App 552, 555-556; 280 NW2d 594 (1979) ("the board erred in concluding that the reason plaintiff left his job is immaterial" because "evidence that an employee left his job for reasons unrelated to his injury tends to establish that he was still able to do the work, and had not suffered a loss in wage earning capacity"); *Frammolino v Richmond Products Co,* 79 Mich App 18; 260 NW2d 908 (1977) (the capacity of a claimant to work and employment opportunities are factors to be considered along with actual wages to determine wage-earning capacity); *Dalton v Candler-Rusche, Inc,* 65 Mich App 282; 237 NW2d 290 (1975) (where an injured worker was laid off after his return to work and was able to find other employment, his postinjury wage-earning capacity was

overruled by this Court.[11]

The first opportunity for this Court to interpret the 1927 amendment of the statute was in *Roxbury v Weidman Lumber Co,* 268 Mich 596; 256 NW 560 (1934). We ordered an award of less than the maximum benefit to an employee who was receiving a lower wage when she returned to the same position she had held at the time of injury. We again addressed wage-earning capacity after the 1927 amendment. *Hood v Wyandotte Oil & Fat Co, supra.*[12] In *Hood,* the employer asserted that the employee whose physical disability precluded a return to preinjury employment and who had no actual postinjury earnings had the training and residual capacity to resume work as a barber. We stated that wage-earning capacity is not limited to wages actually earned because such a holding would encourage malingering and transform com-

established before a nonwork-related heart attack that forced the plaintiff to cease all employment); *Benefield v W R Grace Co,* 34 Mich App 442; 191 NW2d 567 (1971) (where noninjured co-workers also experienced a reduction in wages, the fact that an employee earns less in a job after an injury does not alone establish a reduced earning capacity—if an injury does not reduce an employee's earning capacity, he is not entitled to compensation).

[11] While the judicially created favored-work doctrine may have shadowed and perhaps confused the determination of earning capacity, it did not displace it. See, e.g., *Bower v Whitehall Leather Co,* 412 Mich 172, 182; 312 NW2d 640 (1981) (the favored-work doctrine is a judicial creation whose primary purpose is to allow an employer to reduce or eliminate liability by providing for work the employee is capable of performing); *Powell v Casco Nelmor Corp,* 406 Mich 332, 355, n 12; 279 NW2d 769 (1979) (favored work does not establish earning capacity—favored work only operates to set off employer liability for impairment of earning capacity while the favored work is actually performed).

Amendments of MCL 418.301; MSA 17.237(301) have recently addressed the interplay between favored work and earning capacity with the concept of "reasonable employment." *Wade v General Motors Corp,* 199 Mich App 267, 270; 501 NW2d 248 (1993).

[12] Rather than intended to address *Trask* or *Thayer,* the legislative purpose in redefining disability in 1927 was more likely intended to correct our holding that subsequent employment in new fields of employment did not establish earning capacity. See *Geis v Packard Motor Car Co,* 214 Mich 646; 183 NW 916 (1921).

pensation into a pension. *Id.,* p 192. There is " 'no ground for compensation if the failure [to find work] has its origin in general business conditions . . . .' " *Id.,* p 193 (quoting *Jordan v Decorative Co, supra,* p 525). To award maximum benefits, it must be determined that the employee's earning capacity in other fields is circumscribed by the disability. *Id.,* p 194.

We ordered an award of less than the maximum benefit where an employee received no actual postinjury earnings. *Coleman v Whitehead & Kales Co,* 268 Mich 412; 256 NW 467 (1934). The award represented the diminution of an employee's earning power when his earning capacity at the time of the injury was compared to his earning capacity when seeking compensation. *Id.,* p 414. Reversing an award based solely on the difference between preinjury and postinjury earnings without ascertaining earning capacity, we repeated the requirement in *Barnot v Ford Motor Co,* 282 Mich 37, 39; 275 NW 758 (1937), that in order to hold the employer liable for the loss, the difference between preinjury and postinjury wage must be attributable to the injury:

> This found and measured his partial disability by decreased earnings rather than by capacity to work and made defendant an insurer required to make up the difference between what plaintiff earned before and after the accident. *Such is not the test any more than mere inability to get work.* The test to be applied is whether his injury has decreased his capacity to work as before and, therefore, he has earned less by reason of his physical disability and defendant should be made to respond for the loss occasioned by the injury. [Emphasis added.]

While we excused the board's failure to make a

specific finding regarding impairment of earning capacity in *Donahoe v Ford Motor Co,* 295 Mich 422; 295 NW 211 (1940), we did so because the award of the maximum amount could not have exceeded the former wage when added to residual earning capacity.[13]

We repeated in *Pigue v General Motors Corp,* 317 Mich 311, 316-317; 26 NW2d 900 (1947), that to limit earning capacity to wages actually earned would encourage malingering, and we stated again that the determination of earning capacity must include an examination of the employee's opportunity to obtain suitable employment. In *Pulley v Detroit Engineering & Machine Co,* 378 Mich 418; 145 NW2d 40 (1966), we stated that what the partially disabled employee is able to earn thereafter is a matter of proof and a question of fact. "[I]f the bare elements of proof of what the employee was paid were construed as establishing his 'earning capacity' the whole purpose of the act would be vitiated." *Id.,* p 423.

If, as this Court held in *Jones v Cutler Oil Co,* 356 Mich 487, 490; 97 NW2d 74 (1959), "the real inquiry relates to the monetary worth of the injured workman's services in the open labor market under normal employment conditions," then an employer certainly should be able to refute the inference that the partial disability solely caused the employee's total lack of earnings. Where an employer suggests that other factors, including general economic conditions, have caused or contributed to the loss of wages, the magistrate or the board must go further than finding partial disability and some link to the unemployment—the board must compute impairment of earning capacity.

---

[13] See n 6.

Judicial interpretation is not warranted whenever the language of a statute is clear and unambiguous. *Livonia v Dep't of Social Services,* 423 Mich 466, 487; 378 NW2d 402 (1985); *Achtenberg v East Lansing,* 421 Mich 765, 770; 364 NW2d 277 (1985). Only if the meaning of a statute is unclear, should a court undertake an analysis of the reasonableness of any given construction. *State Treasurer v Wilson,* 423 Mich 138, 144; 377 NW2d 703 (1985). It is apparent from the ordinary meaning of the words chosen by the Legislature that the central focus of § 361(1) is on ability or potential for employment and not actual postinjury earnings. Had the Legislature intended to limit earning capacity to actual wages earned or an offer of employment by the employer, the Legislature surely would have used words to that effect.

Properly interpreted, "able to earn thereafter" provides for consideration of economic conditions and other factors insofar as they reflect the availability or unavailability of work for partially disabled employees. Any interpretation that holds that the extent of disability is irrelevant as long as there is some disability and actual wage loss would be contrary to the plain meaning of the statute and would undermine the purpose of worker's compensation.[14]

In further support of my belief that the factfinder is instructed by statute to determine residual earning capacity at the first hearing, I point to the inherent difference between partial and total disability. Section 351 separately and dis-

---

[14] The purpose of worker's compensation law is that the consuming public should bear the cost of the risk of work-related injuries necessarily inherent in any given industry. *Crilly v Ballou,* 353 Mich 303, 308; 91 NW2d 493 (1958).

Imposing onto the consumer the costs of impairment for reasons other than a work-related injury has never been the purpose of compensation law.

tinctly provides for the treatment of totally disabled workers. The lead opinion treats whether an employee is totally or partially disabled as irrelevant as a practical matter. If the lead opinion is correct in its dismissal of the possibility of partial benefits in this case, it is hard to fathom why the Legislature would have made the distinction when it enacted § 361(1).[15] Where an employee proves an inability to obtain any work because of a partial disability, the maximum rate of compensation should be awarded. Where the lack of opportunity to earn is unrelated to the partial disability, then the lack of earnings should not be compensable under the Worker's Disability Compensation Act.[16]

I agree with the conclusion of the lead opinion that the employee should not bear the burden of unfavorable economic conditions only to the extent

---

[15] In a case involving a part-time worker who was totally incapacitated for work, *Irvan v Borman's, Inc,* 412 Mich 496, 502; 315 NW2d 521 (1982), we explicitly stated that the emphasis should be on earning capacity, not hours worked:

> The primary function of the Worker's Disability Compensation Act is to compensate employees for loss of "earning capacity" and not merely lost wages. At the same time the act seeks to avoid windfalls to those still able to work. A partially disabled worker may have his or her working capacity diminished only slightly, and still be able to remain in the work force earning close or equal to his or her preinjury salary. [Citations omitted.]

[16] In this case, the defendant argues that Sobotka's unemployability was due to his preexisting psychological condition. It has been conclusively determined by the magistrate and by the board that the psychological condition was not related to the employment. There was no finding that the work or the injury significantly aggravated or contributed to the preexisting mental condition. Findings of fact in worker's compensation cases will not be disturbed; only misapprehensions of law will be corrected by this Court. Const 1963, art 6, § 28; MCL 421.38; MSA 17.540; *Stephen's Nu-Ad, Inc v Green,* 168 Mich App 219, 222; 423 NW2d 625 (1988); *Kidd v General Motors Corp,* 414 Mich 578, 592; 327 NW2d 265 (1982). Therefore, the extent to which plaintiff's psychological condition limits his employability cannot be defendant's responsibility. *Carter v General Motors Corp,* 361 Mich 577, 594; 106 NW2d 105 (1960).

that it is addressing the effect of unfavorable economic conditions in combination with the partial disability that further diminishes the claimant's ability to find suitable work. *Powell v Casco Nelmor Corp,* 406 Mich 332, 351; 279 NW2d 769 (1979). The employer should not bear the burden of unfavorable economic conditions that function independently to preclude the claimant from finding employment where the Legislature provided for an assessment of the effect of partial disability on earning capacity. In the appropriate case, the defendant should be able to introduce evidence to support an inference that economic conditions, or other factors independent of the partial disability, are actually responsible for total unemployment. To hold otherwise transforms worker's compensation insurance into unemployment insurance.

The lead opinion states that the employer may refute the causal connection between partial disability and unemployment with evidence that other factors are the cause of the unemployment.[17] I would agree. The result the lead opinion would reach in affirming the board's lack of any specific determination of earning impairment beyond finding partial disability suggests that measuring the link between the absence of wages and the partial disability is an all-or-nothing proposition on the issue of causation.[18] I would reject any all-or-nothing interpretation of the relevancy of the effect of other factors on earning capacity that is suggested

---

[17] *Ante,* p 26.

[18] The lead opinion would affirm the first decision of the WCAB, *ante,* p 33, in which the board merely stated in essence that it found a work-related injury that continued to disable the plaintiff and therefore full benefits were awarded.

Hearing officers and the Worker's Compensation Appellate Commission (formerly the Worker's Compensation Appeal Board) are required to provide legal conclusions and their factual bases on the record in order to facilitate meaningful review. See *Leskinen v MESC,* 398 Mich 501, 509-510; 247 NW2d 808 (1976); *Frammolino,* n 10 *supra.*

in the lead opinion. Such an approach ignores that the absence of wages may be only partially attributable to disability. *Trask* and its progeny require that the extent of the factual link be measured, and only that percentage of actual wage loss be assessed against the employer and ultimately the consumer.

Under the statute, a magistrate could properly find that the partial injury precludes employment to a certain degree, but that other factors, including economic conditions, contribute to the unemployment, and order compensation only to the extent that the work-related injury has precluded employment.

After the second remand from the Court of Appeals in which the board was once again directed to state the residual earning capacity, the board wrote that the partial injury "severely limits [the employee's] ability to engage post-employment." 1989 WCABO 126, 128. Although the Court of Appeals has asked the board three times to determine the precise effect the injury has had on earning capacity in accordance with *Trask* and *Thayer,* the board insists on administering the statute under an interpretation that provides full benefits for any impairment, no matter how minimal. A precise determination of the extent of impairment is therefore irrelevant in its view. While a certain amount of deference is generally due an administrative interpretation of the application of the administrative code governing its own action, that deference does not extend to administrators ignoring the statute's plain language and this Court's precedence and directives.[19]

[19] The separate opinion relies heavily on Dean St. Antoine's assessment of the actual application of worker's compensation law in his 1984 report to then Governor Blanchard. St. Antoine, Workers' Compensation in Michigan, Costs, Benefits, and Fairness, A Report to

The required determination of earning capacity is no doubt a difficult task, but it is no more difficult or speculative than determining whether any given disability is the result of a workplace incident. Further, the Legislature has stated in clear language that such a determination is to be made. It is no excuse to tell employers they are to be liable for total wage loss regardless of what the Legislature said in § 361(1) because it is not easy to figure out what the employer should be responsible for.

Accordingly, I would reverse the decision of the Court of Appeals and remand the case to the WCAC for a determination of the extent that the partial disability has caused the unemployment. While an inference of one hundred percent would be supported where an employee demonstrates partial wage loss and total unemployment, the record does not show that the finder of fact made any determination of the extent the partial injury contributed to total unemployability.[20]

---

Governor Blanchard, December 12, 1984. See *ante,* pp 39-41. As I read the report, it was not an attempt to render a legally correct interpretation of Michigan's worker's compensation law so much as it was an attempt to report the actual application of the law in the field. The record of remand in this case reveals that St. Antoine's report of the practice in worker's compensation law in Michigan to award full benefits to partially disabled workers who have not returned to work was probably accurate. The report does not advance the argument that such practice is consistent with a correct interpretation of the statute.

[20] The lead opinion asserts, *ante,* p 15, n 14, that the WCAB has three times found a total impairment of earning capacity. The first order dated August 8, 1986, states only that there is a finding of partial disability and therefore an award of full benefits without any mention of impairment. The second order contains a statement that full benefits are in order because there is no evidence in the record to indicate that plaintiff has been able to find work. This is by no means a finding by the WCAB that the work-related injury caused a total impairment of earning capacity. Nor would I conclude that the finding as stated in the board's third order, " 'a disability which severely limits his ability to engage post-employment,' " is a statement of total impairment totally due to a work-related injury. Had

Only if the board finds that the partial disability caused total impairment should the maximum award be ordered. If the board determines the work-related injury caused part of the unemployment, the statute requires compensation to be made for that part only.

RILEY and GRIFFIN, JJ., concurred with BRICKLEY, J.

the WCAB once stated that it found a total impairment in wage-earning capacity caused by plaintiff's work-related disability, this case would not be before this Court.